IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTOPHER A. TERAS, et al.     :

     :

   v.          :  Civil Action No. DKC 14-0244

     :

JINHEE KIM WILDE, et al.     :

     :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of settlement agreement case are a motion for partial summary judgment filed by Plaintiffs Christopher A. Teras ("Mr. Teras"), Christopher A. Teras, P.C. ("CATPC"), and Worldwide Personnel, Inc. ("Worldwide") (collectively, "Plaintiffs") (ECF No. 72); a motion for partial summary judgment filed by Defendants Jinhee Kim Wilde ("Ms. Wilde") and Wilde and Associates, LLC ("W&A") (collectively, "Defendants") (ECF No. 73); and a motion to strike documents attached to Defendants' motion, filed by Plaintiffs (ECF No. 75). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, both motions for summary judgment will be granted in part and denied in part, and Plaintiffs' motion to strike will be denied.

I.  **Background**[1]

Mr. Teras and Ms. Wilde are both lawyers who specialize in immigration law.  In 2004, they formed a partnership to practice law, which they organized as Teras & Wilde, PLLC ("T&W").  (ECF No. 73-4, at 5).  A substantial part of T&W's practice involved assisting foreign individuals going through the immigration process to become workers for Case Farms, a poultry processing company operating in Morganton, North Carolina ("CFM") and Ohio ("CFO").  (ECF Nos. 72-1, at 11; 73-4, at 5).  The process in which foreign workers immigrated to the United States to fill unskilled labor positions through the EB3-Other Workers immigrant visa category was commonly referred to as "EW" visa program work.  (ECF Nos. 72-1, at 11; 72-3 ¶ 4).

Although T&W was assisting Case Farms with filling its positions, Case Farms did not pay T&W for these services.  (ECF No. 72-3 ¶ 18).  Rather, T&W collected its fees from foreign recruiters, who apparently collected the fees from the immigrants who sought to move to the United States for these jobs.  (*Id.*).  T&W worked primarily with three foreign recruiters for the Case Farms positions: Edith Lai, David Chang, and Gregory Evans.  (*Id.* ¶ 7).  Because the process of being granted an EW visa can take years and there is no certainty that

---

[1]  Unless otherwise noted, the facts outlined here are undisputed.  Additional facts will be provided in the analysis.

a visa will be granted until the end of the process, T&W charged its fees incrementally.  A client would usually pay a smaller flat fee at each of two or three stages earlier in the process, and then a much larger final payment upon the issuance of a visa. (*Id.* ¶ 18).

Mr. Teras has been doing EW work since at least 1989. (*Id.* ¶ 4).  In 1995, Mr. Teras incorporated Worldwide as a business overseeing both the legal and non-legal work involved in recruiting foreign workers.  (ECF No. 73-10, at 6).  Mr. Teras is the sole owner and shareholder of Worldwide.  (ECF No. 72-3 ¶ 3).  Ms. Wilde did not learn of the existence of Worldwide until after she joined T&W.  (ECF No. 73-4, at 4).  During their partnership, Ms. Wilde and Mr. Teras had disagreements about Worldwide's role because Ms. Wilde believed that Worldwide was simply a "pass-through company that didn't do anything other than what Teras & Wilde did." (*Id.* at 6-7).  In spite of these disputes, all of T&W's EW visa work for CFM and CFO recruits was invoiced to Worldwide rather than any employer, recruiter, or foreign worker.  (ECF Nos. 72-3 ¶ 17; 73-4 at 5).

In late 2008, Mr. Teras and Ms. Wilde sought to dissolve their partnership.  (ECF No. 73-4).  On March 18, 2009, Ms. Wilde filed a lawsuit against Mr. Teras concerning the fair dissolution of the partnership (the "Dissolution Case"); Mr. Teras and Worldwide filed counterclaims against Ms. Wilde in

that suit. (ECF No. 72-3 ¶ 21). In the process of investigating her claims in the Dissolution Case, Ms. Wilde began talking to employees at Case Farms about what relationship Case Farms had with Mr. Teras and with Worldwide. (ECF Nos. 72-14, at 2; 73-4, at 8). After speaking with Ms. Wilde, Case Farms Director of Corporate Human Resources Armando Campos apparently became concerned that Mr. Teras was telling recruiters that Worldwide had a relationship with Case Farms that Mr. Campos did not believe it had. (ECF No. 72-11). As of February 2009, Case Farms began working exclusively with Ms. Wilde and sent a letter to foreign recruiters stating that Case Farms had never worked with Worldwide. (ECF Nos. 72-11; 73-4, at 10). In the week before the parties agreed to settle their dispute, Ms. Wilde spoke with Mike Popowycz, the Chief Financial Officer at Case Farms. (ECF No. 73-8, at 7, 20). Mr. Popowycz told Ms. Wilde on July 12, 2010, that he had no knowledge of a relationship between Case Farms and Worldwide, and he confirmed on July 14, that another Case Farms Human Resources Director, Ken Wilson, had also never heard of Worldwide. (ECF Nos. 72-14; 73-8, at 20). When Ms. Wilde confronted Mr. Teras with the information from Mr. Campos, Mr. Teras told her that these Case Farms employees were mistaken. (ECF No. 73-2 ¶ 13).

Despite the information from Case Farms, Ms. Wilde agreed to a settlement (the "Settlement") with Plaintiffs on July 20,

4

2010.  (ECF No. 72-15).  The Settlement identifies the CFO and CFM recruits who T&W had been assisting, lays out a plan for how the remaining work on these recruits' cases would be done, and specifies how the payments from these recruits should be received and distributed.  (*Id.*).  Worldwide is responsible for hiring "Selected Counsel" to do "Additional Work," which is defined as "all additional legal work concerning the immigrant visa issuance."  (*Id.* at 5, 7).  Although the Settlement provides that Selected Counsel should be chosen from a list created by the parties, it also states that "Teras and Wilde each acknowledge that each [CFO or CFM] Recruit shall have the unimpeded right to retain an independent attorney of his/her choosing and at his/her own cost."  (*Id.*).  After the remaining work is completed, "[a]ll fees, payments, receivables and other funds received by any Party . . . with respect to a recruit identified" are to be delivered to Worldwide.  (*Id.* at 4, 6). Worldwide then keeps a portion of the funds for itself and distributes the remaining funds to Mr. Teras and Ms. Wilde according to specific allocations in the Settlement.  (*Id.*).

In 2013, W&A received payment from Ms. Lai for EW services related to one of the CFM recruits who had previously been represented by T&W.  (ECF No. 72-21, at 2).  On September 10, 2013, Defendants' attorney sent a letter to Mr. Teras explaining that Ms. Lai and the recruit had chosen to have Ms. Wilde do the

remaining legal work and had made a total payment in the amount of $22,000 for the services received since beginning the process with T&W. (ECF No. 72-22, at 2).[2] By Defendants' calculations, Mr. Teras and Worldwide should have received, at most, a combined $10,500 of that payment under the Settlement, and they therefore enclosed a check for $11,000 to Mr. Teras. (*Id.*). As discussed further below, Plaintiffs believed this payment breached the Settlement in a number of ways, and they filed this action on January 27, 2014. (ECF No. 1).

Plaintiffs' complaint contains claims for declaratory relief (Count I), breach of contract (Count II), interference with contractual relationships (Count III), and Interference with Economic Relationships (Count IV). (*Id.*) Defendants' motion to dismiss was denied on February 26, 2015. (ECF Nos. 6; 14; 15). Defendants then filed an answer and two counterclaims, alleging fraud (Count I) and breach of contract (Count II), and seeking declaratory and monetary relief. (ECF No. 19). Plaintiffs moved to dismiss Defendants' counterclaims, but this motion was also denied. (ECF Nos. 24; 55; 56). After proceeding with discovery, Plaintiffs filed the pending motion for partial summary judgment on May 13, 2016. (ECF No. 72).

---

[2] Defendants challenge the admissibility of the letter and check because it was sent "for purposes of settlement only." (ECF No. 72-22, at 2). Defendants have not cited to any of the rules of evidence or explained why they believe it is inadmissible for the purposes used by Plaintiffs here.

Defendants responded and filed their motion for partial summary judgment on May 31. (ECF No. 73.). Plaintiffs responded to Defendants' motion (ECF No. 74) and filed a motion to strike certain documents attached to Defendants' summary judgment motion (ECF No. 75). Defendants replied to the motion for summary judgment (ECF No. 77) and responded to the motion to strike (ECF No. 76). Plaintiffs replied to the motion to strike. (ECF No. 78).

## II.  Plaintiffs' Motion to Strike

Plaintiffs move to strike Defendants' Exhibits 38 (ECF No. 73-23), 43 (ECF No. 73-28), and 48 (ECF No. 73-33). (ECF No. 75). The motion to strike must be resolved first because Defendants rely on the evidence that Plaintiffs seek to strike in connection with their motion for summary judgment. *See Stanley Martin Cos. v. Universal Forest Prods. Shoffner LLC*, 396 F.Supp.2d 606, 611 (D.Md. 2005) (stating that prior to reviewing a motion for summary judgment, the court must evaluate the admissibility of the evidence relied on to support or oppose the motion). In reaching the decision below, however, Defendants' Exhibits 38 and 43 were not considered material. Therefore, Plaintiffs' motion will be denied as moot with regard to these exhibits. *See Wheeler v. Leonard*, No. DKC-2008-0774, 2010 WL 1141199, at *5 n.2 (D.Md. Mar. 22, 2010); *L.M.P. Serv., Inc. v. Shell Oil Co.*, 116 F.Supp.2d 645, 648 (D.Md. 2000).

Defendants' Exhibit 48 is a letter from the District of Columbia Bar Counsel to former T&W recruiter Mr. Evans providing the results of Bar Counsel's investigation into Mr. Teras after Mr. Evans filed a complaint. (ECF No. 73-33). Although Plaintiffs object because Defendants did not produce this letter in discovery, it appears that Plaintiffs also should have produced the document. Defendants requested "All communications between you and Bar Counsel . . . and all documents received by you from Bar Counsel . . . concerning [Ms.] Wilde." (ECF No. 76-1, at 5-6). Plaintiffs argue that the document did not "concern" Ms. Wilde, but it references her possession of certain case files, her continued representation of former T&W clients, and a proposed settlement between Ms. Wilde, Mr. Teras, and Worldwide. (ECF No. 73-33, at 2). It thus appears that both sides should have produced the document during discovery, and, given that both Plaintiffs and Defendants seem to have possessed the letter, neither side can claim to be prejudiced by its non-disclosure. Furthermore, as discussed below, the exhibit is insufficient to create a dispute of fact that Mr. Teras disclosed the Settlement, and therefore is harmless here. *See Clark v. Creative Hairdressers, Inc.*, No. DKC-2005-0103, 2005 WL 3008511, at *7 (D.Md. Nov. 9, 2005) (denying a motion to strike where the evidence would help rather than harm the party moving

to strike).  Accordingly, Plaintiffs' motion to strike will be denied.

## III. Motions for Summary Judgment

### A.   Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

The moving party bears the burden of showing that there is no genuine dispute as to any material fact.  If the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof, however, then there is no genuine dispute of material fact.  *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899

F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). In other words, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted); *see Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled

to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3$^d$ ed. 1998).

### B. Applicable Law

In diversity actions, the choice of law rules of the state in which the district court sits determine the applicable substantive law. *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600 (D.Md. 2002) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, (1938)). Maryland courts honor choice of law clauses in contracts. *Marine Midland Bank v. Kilbane*, 573 F.Supp. 469, 471 (D.Md. 1983), *aff'd*, 739 F.2d 958 (4th Cir. 1984). Under the terms of the Settlement, the Settlement and "any issues arising under, resulting from or relating to [it] shall be governed by and construed in all respects in accordance with the laws of the District of Columbia." (ECF No. 72-15, at 15). Therefore, District of Columbia law applies to Counts I and II of Plaintiffs' complaint and Counts I and II of Defendants' counterclaim. Because Plaintiffs' claims for interference with contractual relationships (Count III) and interference with economic relationships (Count IV) do not arise under the Settlement, Maryland law applies to those claims.

### C. Plaintiffs' Claims

Defendants move for summary judgment on all of Plaintiffs' claims. (ECF No. 73, at 1). Plaintiffs move for summary

judgment on their declaratory judgment claim, and for partial summary judgment on their claims for breach of contract and interference with economic relationships. (ECF No. 72-1, at 10).

### 1. Declaratory Relief

In Count I, Plaintiffs seek a declaration that the Settlement requires Defendants to deliver all payments for the named CFO and CFM recruits to Worldwide for redistribution of the funds according to the allocated amounts in the Settlement. (ECF No. 1, at 13). As part of the remedy for their counterclaims, Defendants also seek a declaration that the "portions of the Settlement [] providing for payments to Worldwide are not enforceable and that Worldwide is not entitled to any future payments under the Settlement." (ECF No. 19, at 11). In their opposition to the motion for partial summary judgment, Defendants now argue that Plaintiffs' declaratory relief action is merely a reformulation of Count II, Plaintiffs' breach of contract claim. (ECF No. 73-1, at 44).[3] Plaintiffs counter that a court "may declare the rights and other legal relations of any interested party seeking such declaration,

_____

[3] Defendants also argue that CATPC should be dismissed from the action because Plaintiffs have not alleged that CATPC has been harmed in any way. (ECF No. 73-1, at 19). Because CATPC is a party to the Settlement that will be interpreted in the declaratory relief claim, and because the enforceability of the Settlement is challenged by various other claims, CATPC remains a necessary party.

whether or not further relief is or could be sought." (ECF No. 74, at 51 (citing 28 U.S.C. § 2201(a)). They also point out that many CFO and CFM recruits still have not obtained immigrant visas, and the parties to this litigation and third parties including Case Farms and the recruiters would benefit from the guidance that declaratory judgment would provide. (*Id.* at 52).

The United States Court of Appeals for the Fourth Circuit has explained that a federal court may properly exercise jurisdiction over declaratory judgment actions where three criteria are met: "(1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for the jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004) (citing 28 U.S.C. § 2201; *Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994)).[4] It is well established that a federal district court has "some measure of discretion" in deciding whether or not to entertain a declaratory judgment action. *Nautilus Ins.*

---

[4] "Federal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even when the case is under the court's diversity jurisdiction." *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990).

*Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 375 (4th Cir. 1994); *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937).   The Fourth Circuit has held that "a federal district court should normally entertain a declaratory judgment action within its jurisdiction when it finds that the declaratory relief sought (i) will serve a useful purpose in clarifying and settling the legal relations in issue, and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Nautilus*, 15 F.3d at 375 (internal quotations and citations omitted).[5] Accordingly, declaratory relief is appropriate here.

          **a.   Interpreting the Contract**

District of Columbia courts apply "an objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite meaning." *Aziken v. District of Columbia*, 70 A.3d 213, 218-19 (D.C. 2013). Generally, the courts will "determine what a reasonable person

---

     [5] Parts of *Nautilus* involving the appellate standards of review were overruled by the Supreme Court in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). "However, the factors articulated which guide the district court's exercise of discretion in a declaratory judgment action remain applicable." *Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 355 F.App'x 698, 699 n.1 (4th Cir. 2009).

in the position of the parties would have thought the disputed language meant." *Travelers Indem. Co. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001). "Where the contract language is not susceptible of a clear and definite meaning — i.e., where the contract is determined by the court to be ambiguous — external evidence may be admitted to explain the surrounding circumstances and the positions and actions of the parties at the time of contracting." *Aziken*, 70 A.3d at 219. If the provisions at issue remain ambiguous, "the correct interpretation becomes a question for a factfinder." *Debnam v. Crane Co.*, 976 A.2d 193, 197-98 (D.C. 2009). However, "a contract is not ambiguous merely because the parties do not agree over its meaning, and courts are enjoined not to create ambiguity where none exists." *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1177 (D.C. 2006).

The parties' dispute as to the interpretation of the Settlement centers around a few key provisions. First, in Sections 4.a. and 5.a., the Settlement states, "All fees, payments, receivables and other funds received by any Party on or after December 1, 2009, with respect to a recruit identified on [attached spreadsheets naming CFO and CFM recruits at the time of the Settlement] shall be delivered to [Worldwide] immediately upon receipt." (ECF No. 72-15, at 4, 6). The rest of each Section lays out how the funds received by Worldwide

15

would be distributed among the parties. (*Id.*). Second, in
Sections 4.c. and 5.c., sections titled "Management of Further
Legal Work," the Settlement provides that Worldwide will be
responsible for engaging and paying "Selected Counsel." (*Id.* at
5, 7). Selected Counsel are attorneys engaged by Worldwide to
perform "Additional Work," which is defined as "all additional
legal work concerning the immigrant visa issuance, including
without limitation all correspondence with the U.S." (*Id.*).
Those sections also note that "Teras and Wilde each acknowledge
that each [CFO or CFM] Recruit shall have the unimpeded right to
retain an independent attorney of his/her choosing and at
his/her own cost." (*Id.*).

The term "Additional Work" is susceptible to two meanings.
"Additional Work" might mean any and all work yet to be done for
the identified recruits, or it might mean any work outside of
what Worldwide or T&W had already agreed to do for these
recruits when they began work on their cases. A contract "must
be interpreted as a whole, giving a reasonable, lawful, and
effective meaning to all its terms, and ascertaining the meaning
in light of all the circumstances surrounding the parties at the
time the contract was made." *Debnam*, 976 A.2d at 197. The rest
of the Settlement indicates that the former reading is correct.
The Settlement talks extensively about the parties choosing
Selected Counsel to do Additional Work (ECF No. 72-15 §§ 4.c.,

5.c.), providing Selected Counsel with case files (*id.* § 12.d.), and assisting Selected Counsel with appearing on behalf of the recruits before withdrawing from representation (*id.*), but it makes no arrangements at all as to whether Mr. Teras, Ms. Wilde, or any entity other than Selected Counsel would complete any remaining work that was already agreed to for the recruits. Therefore, "Additional Work" must refer to all remaining work to be done on the CFO and CFM cases.   Under this interpretation, the Settlement dictates that Worldwide will (1) engage Selected Counsel to complete any remaining work, (2) pay them accordingly, (3) receive all outstanding fees, and (4) allocate them according to the specific distribution provisions of the Settlement.   The recruits' "unimpeded right to retain an independent attorney . . . at his/her own cost" accounts for the fact that some recruits might not want Worldwide selecting new counsel for them when they had originally expected Mr. Teras, Ms. Wilde, or T&W to do their legal work.

The parties next dispute whether Ms. Wilde or W&A have the right to fill that "independent attorney" role and to what effect.   Defendants argue that Ms. Wilde "was free to compete for the business of the recruits," and that she was hired independently as counsel for these recruits.   (ECF No. 73-1, at 35, 37).   They maintain they have a right to receive legal fees from the recruiters on behalf of the CFO and CFM recruits for

17

work done exclusively by them under the engagement letters signed by the recruiters. (*Id.* at 36).

Plaintiffs concede that if the recruits or recruiters chose independently to hire Defendants, they may have a right to an additional amount of money that Worldwide would have willingly paid any other Selected Counsel for such work. (ECF No. 74, at 14). Plaintiffs dispute whether Defendants can bill in a manner that causes a conflict with the incremental payments that would normally be due to Worldwide. If, as Defendants argue, the recruiters and recruits essentially fired Worldwide and hired Defendants, Ms. Wilde has violated Section 11.b.v. of the Settlement, which provides that:

> [n]either Wilde nor any agent or affiliate of Wilde has agreed, negotiated or discussed or will agree, negotiate or discuss any arrangement with any recruiter, with any CFO Recruit or with any CFM Recruit, that would or could result in (A) any payment to [Worldwide] of less than the amounts set forth herein by or on behalf of any recruit, (B) any payment being made to Wilde or any agent or affiliate of Wilde that otherwise would be payable or deliverable to [Worldwide] under this Agreement, or (C) any CFO Recruit or any CFM Recruit dropping out of the CFO Recruit program or CFM Recruit program.

(ECF No. 72-15, at 12). Another provision prohibits Ms. Wilde from interfering "in any way [] with [Worldwide's] efforts to complete work on all pending [Worldwide], CFO Recruit, CFM Recruit, and [other] matters." (*Id.* at 13).

Defendants contend that they can charge whatever legal fees they see fit for the services they provide to these recruits. "If recruits, recruiters, or anyone else owe Worldwide fees they are refusing to pay," Defendants argue that "it is up to Teras to pursue collection of those fees" from those debtors. (ECF No. 77, at 15). According to Plaintiffs, "[i]f Worldwide's fees were reduced because a third party legally took the business that would be one situation; Wilde, however, uniquely and expressly agreed that she would deliver any payments she received (regardless of whether for 'her fees' or 'Worldwide's fees') to Worldwide." (ECF No. 74, at 16).

Defendants' argument clearly misreads Ms. Wilde's obligations under the Settlement. Unlike any other potential "independent attorney," Ms. Wilde is subject to the provisions of the Settlement, which prohibit her from decreasing what amounts get paid to Worldwide. Thus, Defendants may not charge, for example, a second visa issuance fee in amounts that parallel Worldwide's visa issuance fees and reasonably expect not to run afoul of the provisions prohibiting her from infringing on the amounts payable to Worldwide. As Plaintiffs point out, "Wilde's contention that her receipt of fees for the exact same services would not reduce or replace Worldwide's fees . . . simply defies common sense." (*Id.* at 15).

Defendants incorrectly argue that this interpretation of the Settlement would impermissibly "prohibit those clients from choosing Wilde as their lawyer." (ECF No. 77, at 14). Plaintiffs' reading of the Settlement does not restrict the clients' actions at all. It does not, as Defendants argue, dictate that "they are not permitted to pay [the attorney of their choosing] if they choose Wilde." (*Id.*). Rather, the contract imposes duties on Ms. Wilde, specifically, the unextraordinary duty to share with a former business partner funds earned in a new practice that relate in some way to the earlier business enterprise. Thus, the Settlement requires that, where Defendants perform Additional Work, they may not charge fees other those that Worldwide would pay to Selected Counsel. If the fees Defendants charge lead any client to withhold from Worldwide any fees that were previously due to it, Ms. Wilde has breached her obligations under the Settlement. As discussed in the context of the breach of contract claim, Defendants may not direct these clients to pay W&A, and if any such payments are remitted to Defendants, they should deliver them in full to Worldwide.

### b.  Enforceability

Defendants next argue that the Settlement's allocation of fees is unenforceable because it constitutes the splitting of legal fees in violation of District of Columbia Rule of

Professional Conduct 5.4(a), which states that a "lawyer or law firm shall not share legal fees with a nonlawyer." (ECF No. 73-1, at 38). Defendants maintain that Worldwide is not a lawyer or law firm and therefore sharing the fees they receive with Worldwide would violate the Rule. (*Id.*).

Plaintiffs contend that Defendants' reading of Rule 5.4(a) is overly rigid, given that Mr. Teras is a lawyer and he is Worldwide's only employee. (ECF No. 72-1, at 46). Plaintiffs argue that, even if the distributions laid out in the Settlement would constitute improper fee-sharing, Defendants cannot use the Rules of Professional Conduct to avoid their contractual obligations. (*Id.* at 42). They cite to *Landise v. Mauro*, 725 A.2d 445, 451 (D.C. 1998), in which the District of Columbia Court of Appeals held that distributions due under a partnership agreement were enforceable even though one partner was engaged in the unauthorized practice of law. Although enforcing the partnership agreement in some ways condoned the unauthorized practice, the court found that not enforcing the agreement "would be overly simplistic as it would bestow a windfall, at the expense of another and without significant public benefit, on a party who participated in and benefitted from the unauthorized practice." *Id.* at 451-52.

Defendants point out that in *Landise*, the court enforced a contract (a partnership agreement) that did not itself violate

the Rules.    Rather, it was one partner trying to avoid
enforcement of the partnership agreement because the other had
independently violated the Rules.   Here, Plaintiffs ask the
court to enforce affirmatively a fee-sharing scheme that
arguably would violate the Rules.   (ECF No. 73-1, at 40).   Given
this distinction, they argue that there is no District of
Columbia case on point and suggest that a Maryland case, *Son v.
Margolius, Mallios, Davis, Rider & Thomar*, 349 Md. 441 (1998),
provides persuasive authority for the proposition that a fee-
splitting agreement with a non-lawyer is unenforceable.   (ECF
No. 77, at 16).   Defendants misread *Son*; there, the Court of
Appeals of Maryland relied heavily on *Post v. Bregman*, 349 Md.
142, 168 (1998), which held that "enforcement of [the Rules] is
not limited to disciplinary proceedings [and] *may* extend to
holding fee-sharing agreements in clear and flagrant violation
of [the Rules] unenforceable."   *Id.; see also Son*, 349 Md. at
461.   The Court of Appeals emphasized that the Rules are "not a
*per se* defense, rendering invalid or unenforceable otherwise
valid fee-sharing agreements because of rule violations that are
merely technical, incidental, or insubstantial or when it would
be manifestly unfair and inequitable not to enforce the
agreement." *Post*, 349 Md. at 168; *Son*, 349 Md. at 461.   Because
the Rules "are not designed to be a basis for civil liability[,]
the purpose of the Rules can be subverted when they are invoked

22

by opposing parties as procedural weapons." *Id.* (citing Maryland Attorneys' Rules of Prof'l Conduct, Preamble n.20). The Court of Appeals held that courts should "look to all the circumstances" when determining whether to enforce an agreement, "including, among other things, the nature of the violation, how it came about, the extent to which the parties acted in good faith, whether the violation has some particular public importance, and whether the client, in particular, would be harmed by enforcing the agreement." *Son*, 349 Md. at 461 (citing *Post*, 349 Md. at 169-170). The court in *Landise* took a similar approach. *See Landise*, 725 A.2d at 451-52 and nn.14-15.

Plaintiffs argue that there is no public interest that would be served by rendering the Settlement unenforceable. (ECF No. 72-1, at 44). This is not a case where an attorney is violating the Rules at the expense of a client, but rather an agreement reached by sophisticated parties - lawyers with further representation - and designed to end pending litigation. (*Id.* at 45-46). Defendants contend that if parties could avoid Rule 5.4 by simply signing a contract agreeing to the fee-sharing, the ethical prohibition would be vitiated (ECF No. 73-1, at 40), but this argument ignores the primary enforcement mechanism for violations of the Rules, disciplinary proceedings by Bar Counsel.

Defendants assert that the situation here is different from
*Landise* and other cases because declining to enforce the fee-
splitting agreements in those cases would have resulted in
unjust enrichment to the lawyer. (ECF No. 73-1, at 41). They
say Wordwide has not and will not provide any services to these
clients, and therefore it does not warrant any fees. (*Id.*).
Plaintiffs argue that Ms. Wilde would be unjustly enriched,
allowing her to collect fees that would be paid to Worldwide
even though Worldwide gave notable consideration for these fees,
including releasing its counterclaims against her and agreeing
to manage, discharge, and indemnify Ms. Wilde for T&W's
liabilities. (ECF No. 72-15, at 3, 9). Plaintiffs also
emphasize that the allocation of funds laid out in the
Settlement was based on the longstanding relationship between
Worldwide, Mr. Teras, Ms. Wilde, and T&W. (ECF No. 72-1, at
43). In their reply, Defendants seem to admit that some fees
should be shared with Worldwide "for work already done." (ECF
No. 77, at 17). Thus, they appear to take issue with the split
of some specific fees received by W&A, not with fee-splitting
generally.

Declaring the Settlement's allocation of funding to
Worldwide unenforceable would disrupt the intent of the parties
at the time the Settlement was signed and result in a windfall
for Ms. Wilde. Preventing enforcement would affect only the

parties involved and serve no purpose to any clients or the public. Accordingly, Plaintiffs' motion for summary judgment on their claim for declaratory relief will be granted in accordance with the interpretation of the contract described above.

### 2. Plaintiffs' Breach of Contract Claim

Plaintiffs seek summary judgment as to liability based on three breaches of the Settlement. Plaintiffs contend that Ms. Wilde violated: (1) Section 5.a. by failing to deliver payments for services on behalf of CFO and CFM recruits to Worldwide for redistribution among the parties and by attempting to distribute to Mr. Teras and Worldwide amounts differing from the allocations outlined in the Settlement; (2) Section 11.b.v.(B) by instructing recruiters to pay W&A directly rather than to submit payments to Worldwide; and (3) Section 11.b.v.(A) by entering into arrangements that led to Worldwide being paid less than the amounts set forth in the Settlement. (ECF No. 72-1, at 51-53).

Section 5.a. of the Settlement requires that "All fees, payments, receivables and other funds received by any Party on or after December 1, 2009, with respect to a recruit . . . shall be delivered to [Worldwide] immediately upon receipt." (ECF No. 72-15, at 6). Section 11.b.v.(B) requires that "[n]either Wilde nor any agent or affiliate of Wilde . . . will agree, negotiate or discuss any arrangement with any recruiter . . . that would

25

or could result in . . . (B) any payment being made to Wilde or any agent or affiliate of Wilde that otherwise would be payable or deliverable to [Worldwide] under this Agreement." (*Id.* at 12). Plaintiffs have shown that Defendants breached Sections 5.a. and 11.b.v.(B) when Defendants received payment for work done for one of the CFM recruits from Ms. Lai in 2013. (ECF No. 72-21, at 2). Defendants admit that they did not deliver all funds from this payment to Worldwide. Nor is there a dispute that their invoice directed Ms. Lai to "make checks payable to 'Wilde and Associates, LLC'" for a payment for work done for a CFM recruit. (*Id.*). Defendants' actions thus breached these sections of the Settlement, and Plaintiffs are entitled to summary judgment as to liability for these breaches.

Section 11.b.v.(A) requires that "[n]either Wilde nor any agent or affiliate of Wilde . . . will agree, negotiate or discuss any arrangement with any recruiter . . . that would or could result in . . . any payment to [Worldwide] of less than the amounts set forth [in the Settlement] by or on behalf of any recruit." (ECF No. 72-15, at 12). The amount for which W&A invoiced Ms. Lai, $22,000, is less than the anticipated $27,000 total payment set forth in the Settlement for a CFM recruit (ECF No. 7, at 5), but it is unclear whether this amount was intended to supplant all the fees due to Worldwide. Accordingly, both

motions for summary judgment will be denied based on this purported breach.

### 3.   Interference Claims

Both parties also seek summary judgment as to Plaintiffs' claims for wrongful interference.  Because these claims do not relate to the Settlement, Maryland law applies to them here.  As noted in this court's prior memorandum opinion, "Maryland recognizes the tort action for wrongful interference with contractual or business relationships in two general forms: inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 650 (1994).  Plaintiffs allege both types of interference in this action.

### a.   Interference with Contractual Relationships

Count III of Plaintiffs' complaint is a claim for interference with contractual relationships.  (ECF No. 1 ¶¶ 54-62).  To establish such a claim, a plaintiff must demonstrate:

> (1) [t]he existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom.

*Blondell v. Littlepage*, 185 Md.App. 123, 153-54 (2009), *aff'd*, 413 Md. 96 (2010).  Defendants seek summary judgment as to Count III because Plaintiffs have not produced any evidence of a contractual relationship with Case Farms or the recruiters with which Ms. Wilde could have interfered.  (ECF No. 73-1, at 29).  Plaintiffs do not dispute this in their opposition to the motion.  Therefore, Defendants are entitled to summary judgment on this claim.

### 4.  Interference with Economic Relationships

In Count IV of Plaintiffs' complaint, they allege interference with economic relationships.  (ECF No. 1 ¶¶ 63-70).  To establish such a claim, a plaintiff must demonstrate "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."  *Alexander & Alexander*, 336 Md. at 652 (internal quotation marks omitted).  In *Alexander & Alexander*, the Court of Appeals clarified what conduct may constitute wrongful or malicious conduct:

> [W]e have made clear in our cases that acting to pursue one's own business interests at the expense of others is not, in itself, tortious.

> . . . .
>
> . . . [T]ortious intent alone, defined as an intent to harm the plaintiff or to benefit the defendant at the expense of the plaintiff, [is] not sufficient to turn deliberate interference into a tort, [] the defendant must interfere through improper or wrongful means.
>
> Therefore, wrongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.

336 Md. at 653-57. Plaintiffs assert that Ms. Wilde interfered with their relationships with Case Farms and with foreign recruiters, including Ms. Lai, Mr. Chang, and Mr. Evans. (ECF No. 1 ¶ 66).

### a. Interference with Plaintiffs' Relationship with Case Farms

Plaintiffs assert that they are entitled to summary judgment on this claim because Ms. Wilde intentionally sought to take Case Farms' business from Worldwide during and after the dissolution of T&W. (ECF No. 72-1, at 54). They argue that Ms. Wilde's conduct was intended to harm Plaintiffs' business relationships and that her actions satisfy the third element's

"wrongfulness" requirement because she breached her duties under the Maryland Lawyers' Rules of Professional Conduct. (*Id.* at 55). Specifically, Plaintiffs contend that Ms. Wilde used information relating to the representation of Worldwide, a former client, to the disadvantage of that client, in violation of Rule 1.8. (*Id.*). They further argue that Ms. Wilde's usurpation of business from Worldwide violated her fiduciary duties as its former attorney and agent. (*Id.* at 56).

Defendants continue to dispute whether Worldwide had any relationship with Case Farms with which to interfere. (ECF No. 73-1, at 29). Defendants argue that, even if it did, Plaintiffs released these claims in the Settlement. (*Id.* at 28).[6]  In the

---

[6] Plaintiffs contend that Defendants may not rely on the affirmative defense of release because they did not assert it in their answer to Plaintiffs' complaint. (ECF No. 74, at 45). Although a defendant "generally bears the burden of affirmatively pleading" the existence of affirmative defenses, *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 (4th Cir. 2006), "it is well established that an affirmative defense is not waived absent unfair surprise or prejudice." *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 205 n.3; *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612-13 (4th Cir. 1999). Given that Defendants made release arguments in their motion to dismiss, Plaintiffs were aware of Defendants' release defense prior to their answer. Plaintiffs assert that they are prejudiced by not being able to take discovery related to this defense, but it is unclear what additional information they could seek. (ECF No. 74, at 45-46). Plaintiffs raised their own release defense to Defendants' fraud claim based on the same provision and have obtained testimony and documents from Ms. Wilde, Case Farms officials, and the foreign recruiters on the topic of interference before and after the signing of the Settlement. (*Id.* at 36, 38). Plaintiffs also had ample opportunity to present arguments about this defense, and did so,

Settlement, Plaintiffs released "any and all claims . . . resulting from, arising out of, taking place or relating to any act or omission occurring prior to the Effective Date of this Agreement." (ECF No. 72-15, at 3).[7]  In their motion to dismiss, Defendants argued that Plaintiffs had released their claims for interference because they matched the same allegations Mr. Teras had made in the Dissolution Case.  (ECF No. 6, at 8). Plaintiffs' claim survived Defendants' motion because they alleged certain conduct occurring after the Settlement.  (ECF No. 14, at 22).  The evidence now shows that Case Farms chose to work "solely" with Ms. Wilde as of February 1, 2009, and made clear prior to the Settlement that it no longer would be working with Mr. Teras or any other of Mr. Teras's companies.  (ECF No. 72-11, at 2).  Thus, Plaintiffs' have not presented any evidence showing "actual damage and loss resulting" from Ms. Wilde's conduct after the Settlement.[8]

_____

in their response.  (*Id.* at 38).  Therefore, Plaintiffs have not been prejudiced by Defendants' use of the release defense here.

    [7] Plaintiffs also contend that they released only Ms. Wilde and not Wilde & Associates in the Settlement.  (ECF No. 74, at 46-47).  Wilde & Associates qualifies under the Settlement as an "Affiliate" because it is a beneficiary, successor, or assign of Ms. Wilde's business with Case Farms and the recruiters here.

    [8] Plaintiffs make a passing argument that "if the Court accepts Wilde's claim that intentional torts cannot, as a matter of law, be released, then the release would not bar liability for Wilde's intentional tortious interference." (ECF No. 74, at 45).  This argument is based on Defendants' response to

### b.    Interference with Plaintiffs' Relationships with Foreign Recruiters

Plaintiffs next argue that they are entitled to summary judgment on their interference with economic relationships claim based on Defendants' interference with Plaintiffs' relationships with foreign recruiters.  They point to several actions taken by Ms. Wilde after the Settlement that allegedly constitute interference, including: (1) an email from Ms. Wilde to Mr. Chang in which she threatens to revoke Case Farms' business with him if he continues to "deal with Teras in the future" (ECF No. 72-20, at 2-3), and (2) involvement in an email from Mr. Popowycz to recruiters stating, "If Mr. Teras and his company [Worldwide] continue with their [statements] about their relationship with any Case company, we will be forced to terminate relationships with anyone who continues to work with or have dealings with Mr. Teras" (ECF No. 72-19, at 2).

---

Plaintiffs' contention that Defendants released their fraud claim in the Settlement, an issue not reached for reasons stated below.  The cases cited by Defendants support the limited proposition that a release induced by fraud does not release the corresponding fraud claim.  *See, e.g.*, *Wells v. Allstate Ins. Co.*, No. Civ.A. 00-0760-LFO, at *6 (D.Md. Jan. 24, 2006) ("It is indeed important for parties to be able to rely on the explicit language of an agreed-upon release.  An essential predicate to reaching agreement, however, is the assumption that one party has not willfully misled the other.  Absent that predicate, the agreement is not enforceable by the misleading party.").  To the degree that Plaintiffs incorporate Defendants' arguments on this point, they are inapplicable.

Plaintiffs again cannot show "actual damage and loss resulting" from these purported actions. Both situations involve Mr. Teras's continued involvement with the Case Farms recruits. Ms. Wilde's threat to stop working with Mr. Chang is in the context of "dealing with [Mr. Chang] on these [Case Farms] cases." (*Id.*). Moreover, Plaintiffs have not produced evidence of any business lost from these recruiters other than the Case Farms business. (*See* ECF No. 72-1, at 57). Rather, both Mr. Chang and Ms. Lai have specifically stated that they would be willing to work with Mr. Teras on other projects. (ECF Nos. 73-6, at 15, 29; 73-7, at 56-57). The record does not show the existence of a genuine dispute of fact as to Defendants' alleged interference with Plaintiffs' relationships with recruiters. Accordingly, as to all of Count IV, Plaintiffs' motion will be denied and judgment will be entered in favor of Defendants.

### D.   Defendants' Counterclaims

Defendants' counterclaims assert fraud (Count I) and breach of contract (Count II) claims. (ECF No. 19). In their breach of contract counterclaim, Defendants allege that Plaintiffs breached the Settlement by disclosing the Settlement and by voluntarily assisting Bar Counsel in a legal proceeding against Ms. Wilde. Plaintiffs seek summary judgment in full as to Defendants' fraud claim and as to the disclosure arguments under

their breach of contract claim.   Plaintiffs also seek partial summary judgment limiting Defendants' to nominal damages for their breach of contract claims based on assistance of counsel. Defendants seek summary judgment as to liability on both counterclaims.

### 1.   Fraud

In the District of Columbia, the general three-year statute of limitations applies to fraud claims. *Sandza v. Barclays Bank PLLC*, 151 F.Supp.3d 94, 110 (D.D.C. 2015) (applying D.C. Code § 12-301(8)).   For statute of limitations purposes, a claim usually accrues at the time the alleged injury occurs.   *Sandza*, 151 F.Supp.3d at 111 (citing *Diamond v. Davis*, 680 A.2d 364, 389 (D.C. 1996)).   District of Columbia courts apply the more forgiving "discovery rule" where "the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs." *Id.* (quoting *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986)).   Under the discovery rule, a claim accrues when a plaintiff has "actual or inquiry notice of (1) the existence of the alleged injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Id.* (quoting *Drake v. McNair*, 993 A.2d 607, 617 (D.C. 2010)). Inquiry notice requires only that a plaintiff know enough to give rise to a duty to inquire further.   *Id.* at 112.   Therefore, even if a plaintiff does not know everything about her potential

34

claim, the limitations period will begin to run when "a potential plaintiff, in the exercise of reasonable diligence, could learn enough to justify filing suit." *Id.* "The critical question in assessing the existence *vel non* of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to [her]." *Ray v. Queen*, 747 A.2d 1137, 1141-42 (D.C. 2000).

In fraud cases, the statute of limitations usually will not begin to run "until the date the fraud is discovered, or reasonably should have been discovered." *Drake*, 993 A.2d at 617. If the defrauding party affirmatively acts to conceal the existence of a claim or the facts underlying a claim, the limitations period will be tolled. *Id.; William J. Davis, Inc. v. Young*, 412 A2d 1187, 1192 (D.C. 1980) ("[A]ffirmative efforts to divert or prevent discovery of the original fraud give a continuing character to the original act which deprives it of statute of limitations protection until discovery."). On the other hand, if a party has suspicions of wrongdoing, she has an "obligation to move promptly and with reasonable diligence to inquire further into the matter," *Drake*, 993 A.2d at 619 (citing *In re Estate of Delaney*, 819 A.2d 968, 982 (D.C. 2003)), and it is not reasonable to rely on the representation "if the party had an adequate opportunity to conduct an independent

investigation and the party making the representation did not have exclusive access to such information," *id.* at 621 (citing *In re Estate of McKenney*, 953 A.2d 336, 343 (D.C. 2008). In evaluating the reasonableness of a plaintiff's diligence, courts also consider the relationship between the plaintiff and the defendant; "in a close, confidential relationship, the degree of reasonable reliance is likely to be much greater – and the reasonable diligence . . . much less – than would exist where the parties had been in an adversary relationship." *Id.* at 620 (citing *Diamond*, 680 A.2d at 376, 378). Whether a party acted reasonably under the circumstances is thus a "highly factual analysis, which takes into account the conduct and misrepresentations of the defendant . . . and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations." *Id.* at 617.

Defendants allege that Mr. Teras fraudulently induced Ms. Wilde to agree to the Settlement by misrepresenting the relationship between Worldwide and Case Farms. (ECF No. 73-1, at 20). Their evidence of this fraud consists primarily of statements from Case Farms officials, specifically Mr. Popowycz and Joseph Carney, the assistant secretary and outside general counsel for Case Farms. (*Id.* at 8). At his deposition, Mr. Popowycz testified that Worldwide had not represented Case Farms or overseen its process for recruiting foreign workers. (EF No.

73-8, at 23, 31).   Mr. Carney testified that he was tasked with resolving the question of whether or not Worldwide ever had a contract with Case Farms (ECF No. 73-9, at 7), and he conducted an investigation into the relationship between the two companies (*id.* at 9).   After investigating the matter and talking with various Case Farms personnel, Mr. Carney concluded that Case Farms had never worked with Worldwide, and he wrote a letter explaining as much to Mr. Teras in March 2013.   (ECF No. 73-29). Mr. Teras never responded to that letter.   (ECF No. 73-9, at 23).   Defendants assert that, for purposes of the statute of limitations, they did not discover the fraud, until Mr. Carney concluded his investigation of the matter in March 2013.   (*Id.* at 25).

Defendants' position that Ms. Wilde had not discovered the alleged fraud until 2013 is belied by the evidence.   Ms. Wilde testified that she was suspicious of Worldwide even before the dissolution of T&W in 2008.   (ECF No. 73-4, at 6-7).   In March 2009, Case Farms' Director of Corporate Human Resources sent a letter to recruiters stating, "we have never worked with Worldwide Personnel or any other company that Mr. Teras may have.   We have only worked with the law firm of Teras & Wilde, PLLC."   (ECF No. 72-11, at 2).   Ms. Wilde admits she was aware of this letter; in fact, she forwarded it directly to Ms. Lai on March 18, 2009.   (ECF No. 72-12).   In November 2009, Mr. Evans

testified at a deposition for the Dissolution Case that he believed Worldwide was "formed as a tax shelter." (ECF No. 73-5, at 5, 7).  In July 2010, Mr. Popowycz told Ms. Wilde that he personally had no knowledge of Worldwide and that a previous Case Farms Human Resources director, Ken Wilson, had also neither heard of nor made a contract with Worldwide. (ECF Nos. 72-7, at 7; 72-14, at 2).

It is unclear why Defendants contend that the prior statements made both in response to Ms. Wilde's inquiries and sent along to the third-party recruiter were inconclusive, but Mr. Carney's determination was sufficient.  They argue that Mr. Teras disputed the earlier statements, but he continues similarly to refute Mr. Carney's findings now.  Ms. Wilde also stated in an email to Mr. Chang on July 26, 2012, that, "I even settled the lawsuit with him . . . only to learn . . . that TERAS committed fraud because WWP was NEVER hired by Case Farm." (ECF No. 72-20, at 2).  This email shows that she believed Mr. Teras had committed fraud well before Mr. Carney's letter.

Moreover, the discovery rule in this context does not require conclusive proof of wrongdoing.  *See Bradley v. Nat'l Ass'n of Secs. Dealers Dispute Resolution, Inc.*, 433 F.3d 846, 849 (D.C. Cir. 2005) ("A plaintiff is on such 'inquiry notice' of wrongdoing when the plaintiff has reason to suspect that the defendant did some wrong, even if the full extent of the

wrongdoing is not yet known."); *Morton v. Nat'l Med. Enters., Inc.*, 725 A.2d 462, 469 (D.C. 1999) (noting that District of Columbia courts had specifically rejected the notion the discovery rule means that a claim does not accrue "until a claimant has had a reasonable opportunity to discover all of the essential elements of a possible cause of action"). Just because Ms. Wilde continued investigating does not mean she was not aware of the injury, cause, and wrongdoing so as to trigger discovery.

The duty to investigate requires diligence and a corollary duty to act reasonably to protect her own interests. A party cannot simply "initiate an investigation," but simultaneously continue "clos[ing] his eyes and blindly rely[ing] upon the assurances of another [party] absent some fiduciary relationship or emergency." *Hercules & Co. v. Shama Restaurant Group*, 613, A.2d 916, 934 (D.C. 1992). If the investigation yields results that would cause her to question the veracity of Mr. Teras's representations – and the evidence available to Ms. Wilde in 2010 here did – she had a duty to investigate fully at that time and should not have agreed to the Settlement. *See Drake*, 993 A.2d at 625 ("If [the plaintiff] had any suspicions . . . she should not have signed the Settlement Agreement in the first place; rather, she should have taken affirmative steps *at that time* to investigate any possible fraud."). Defendants' fraud

claims thus accrued on or before July 14, 2010, and her counterclaim for fraud in this case is untimely.[9]   Plaintiffs' motion for summary judgment will be granted and Defendants' motion will be denied.

For similar reasons, Defendants cannot successfully assert fraud as a defense to Plaintiffs' breach of contract claim. Although the statute of limitations does not apply to affirmative defenses, Plaintiffs contend that they are entitled to summary judgment because any reliance on Mr. Teras's purportedly fraudulent statements was unreasonable.   (ECF No. 72-1, at 33-36).[10]

---

[9] Defendants also claim that there was no injury prior to 2013 when Worldwide and Mr. Teras demanded that the Settlement be enforced as to the payment Defendants received from Ms. Lai. (ECF No. 73-1, at 25).   Plaintiffs argue that damages accrued much earlier because Ms. Wilde has claimed that she "acquiesced to hundreds of thousands of dollars of additional payments going to Teras, under the auspices of Worldwide [and] would not have agreed to those additional payments had she known Teras's representations about Worldwide were false."   (ECF No. 19, at 10).   These monetary losses constituted harms that would have been readily apparent to Ms. Wilde.   Alternatively, Ms. Wilde's release of her claims against Mr. Teras in the Dissolution Case by way of the Settlement would also constitute harm as of the signing of that agreement.   In the Settlement, Ms. Wilde agreed to end her suit against Plaintiffs; if she was fraudulently induced to settle, accepting that agreement would clearly constitute harm.

[10] Even if Defendants' counterclaim for fraud is barred by the statute of limitations, they may assert it as an affirmative defense to Plaintiffs' breach of contract claim.   Although Defendants did not plead fraud as an affirmative defense in the answer portion of their Answer and Counterclaim, Defendants now argue that they should prevail on Plaintiffs breach of contract

"The essential elements of fraud are: (1) a false representation, (2) concerning a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) upon which reliance is placed." *Higgs v. Higgs*, 472 A.2d 875, 876 (D.C. 1984). District of Columbia courts have repeatedly "imposed a 'very high standard' on sophisticated business entities claiming fraudulent inducement in arms-length transactions." *Washington Inv. Partners of Deleware, LLC. v. Securities House, K.S.C.C.*, 28 A.3d 566, 575-76 (D.C. 2011); *see also id.* at 575 n.8. (identifying a party who, *inter alia*, holds

---

claim because Plaintiffs fraudulently induced Ms. Wilde to agree to the Settlement. (ECF No. 73-1, at 34). Fed.R.Civ.P. 8(c)(2) states, "If a party mistakenly designates a defense as a counterclaim[,] the court must, if justice requires, treat the pleading as though it were correctly designated." *See also Re/Max v. Underwood*, No. WDQ-10-2367, 2011 WL 2118911, at *4 (D.Md. May 25, 2011). "This flexibility in the rules 'reflects the conscious attempt . . . to ignore pleading technicalities' and 'promotes the liberality with which courts generally construe pleadings under the federal rules.'" *Fluxo-Cane Overseas, Ltd. V. E.D. & F. Man Sugar, Inc.*, No. WDQ-08-0356, 2010 WL 4285005, at *2 n.3 (D.Md. Oct. 29, 2010) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1275 (3$^{d}$ ed. 2004)). These considerations have led at least one other court to consider a defendant's counterclaim for fraudulent misrepresentation sufficient to assert fraud as both a counterclaim and an affirmative defense in spite of the requirement in Rule 8(c)(1) that affirmative defenses be included in the answer. *Dubied Machinery Co. v. Vt. Knitting Co.*, 739 F.Supp. 867, 871 (S.D.N.Y. 1990) ("Where a plaintiff has been made aware of the defendant's theory of the case, as plaintiff was here, it would be counter to the language and spirit of Rule 8(c) to fail to recognize an affirmative defense simply because it was labeled solely as a counterclaim."). The merits of Defendants' fraud allegations as a defense to Plaintiffs' breach of contract claim are therefore considered.

a law degree as a sophisticated party). Such a party "must establish by clear and convincing evidence that . . . [its] reliance on the alleged material misrepresentations *was reasonable*." *Id.* at 576; *see also Railan v. Katyal*, 766 A.2d 998, 1009 (D.C. 2001) (citing *Hercules & Co.*, 613 A.2d at 923); *cf. Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999) ("When [a] party must produce clear and convincing evidence to support its claim, that higher evidentiary burden is considered as part of the summary judgment calculus.").

Defendants argue that Ms. Wilde's reliance was reasonable because her investigation was "inconclusive" at the time of the Settlement. (ECF No. 77, at 10). They maintain that Plaintiffs' position would have required Ms. Wilde to "investigate[ until she could] prove the falsity of a fact which Teras insists is true." (*Id.*). Defendants conflate the reasonableness of Ms. Wilde's beliefs with the reasonableness of her affirmative reliance. The question in a reasonable reliance inquiry is not whether Ms. Wilde was able to obtain conclusive proof that Mr. Teras had made a misrepresentation at the time, but, rather, whether a reasonable person would have taken Mr. Teras's statements at face value and chosen to move forward with the Settlement in reliance on those statements, given the evidence she had already received from Case Farms.

In a similar situation, the District of Columbia Court of
Appeals found that statements like Mr. Teras's are "not the type
on which she was entitled to place dispositive reliance" because
Ms. Wilde had "an adequate opportunity to conduct an independent
investigation" into the matter and Mr. Teras "did not have
exclusive access to such information." *Howard v. Riggs Nat'l
Bank*, 432 A.2d 701, 707 (D.C. 1981).  Although Defendants cite
the good faith requirement in *McKenney*, they ignore that, in
that case, unlike here, the defrauding party had "prevent[ed]
the] plaintiff from making a reasonable inquiry." *McKenney*, 953
A.2d at 343 (citing *FS Photo, Inc. v. PictureVision, Inc.*, 61
F.Supp.2d 473, 483 (E.D.Va. 1999)).[11]   There, the court
emphasized that the fraud plaintiff's reliance was reasonable
where the defrauding party "pressed McKenney vigorously for an

---

[11] Defendants cite *McKenney* for the proposition that a
party's "fault in not knowing or discovering the facts before
making the contract does not make his reliance [upon a
misrepresentation] unjustified unless it amounts to a failure to
act in good faith and in accordance with reasonable standards of
fair dealing." *McKenney*, 953 A.2d at 343.  This language comes
directly from the Restatement (Second) of Contracts § 172, and
the illustrations and cases cited by the Restatement make clear
that the limitations on investigation are for fraud plaintiffs
without any knowledge or reason to suspect the falsity of the
alleged misrepresentation.  The Restatement also notes that
"[i]n determining whether the recipient of a misrepresentation
has conformed to the standard of good faith and fair dealing,
account is taken of his peculiar qualities and characteristics,
including his credulity and gullibility, and the circumstances
of the particular case," and that a party "is expected to use
his senses and not rely blindly on the maker's assertion."
Restatement (Second) of Contracts § 172, cmt. b.

immediate decision in the face of the impending demolition [of the house on the property in question]." *Id.* at 343.   Ms. Wilde has not argued that there were any time constraints requiring her either to accept or reject the Settlement terms on July 20, 2010, or any other date.   Here, where all of the Case Farms officials she had talked to up to that point had told her they had not heard of Worldwide – including Mr. Popowycz just days earlier – a reasonable person would not have trusted Mr. Teras and would have delayed the Settlement to investigate further. "The presence of a fraudulent misrepresentation does not excuse the injured party from acting reasonably to protect her interests." *Drake*, 993 A.2d at 620.   Defendants' fraud defense therefore also fails as it relates to Plaintffs' breach of contract claims.

## 2.   Defendants' Breach of Contract Counterclaim

Defendants also claim that Mr. Teras breached the Settlement by disclosing it to the District of Columbia Office of Bar Counsel ("Bar Counsel") and assisting with Bar Counsel's investigation of Ms. Wilde.   (ECF No. 19, at 11).   Defendants seek summary judgment as to liability and declaratory relief on this claim.   (ECF No. 73, at 1).   Plaintiffs seek summary judgment on Defendants' disclosure arguments and partial summary judgment limiting the claim to nominal damages as it relates to assisting Bar Counsel.   (ECF No. 72-1, at 10).

The confidentiality provision of the Settlement requires that each party "shall keep this Agreement confidential and shall not disclose any terms of this Agreement to any individual, association, corporation, government agency, or other entity." (ECF No. 72-15, at 14). Defendants argue that Mr. Teras disclosed the terms of the Settlement to Bar Counsel based on a 2012 letter from Bar Counsel to Mr. Evans regarding an investigation into Mr. Teras based on a complaint by Mr. Evans. (ECF No. 73-33). In the letter, Bar Counsel makes several findings related to "the proposed settlement agreement" between Mr. Teras and Ms. Wilde and the effect of that agreement on former T&W clients. (*Id.* at 2). Defendants argue that Mr. Teras must have disclosed the Settlement in order to defend himself against the complaint, or that he must have disclosed it to a third party who shared it with Bar Counsel, since Ms. Wilde has not disclosed it herself. (ECF No. 73-1, at 45).

Mr. Teras has stated in an affidavit that he has "never disclosed the Settlement Agreement to D.C. Office of Bar Counsel or any other person." (ECF No. 72-3 ¶ 35). Moreover, the references in Bar Counsel's letter are to "the proposed settlement agreement," as opposed to any completed settlement. Plaintiffs argue that the proposed agreement referenced is the one that Mr. Evans attached to his Bar Counsel complaint, which is dated June 30, 2009, well before the signing of the

Settlement.   (ECF No. 74-4, at 29-34).   Defendants attempt to overcome this evidence by pointing out that Mr. Evans produced two different proposed settlements with his Bar Counsel complaint, but Bar Counsel only referenced one of them.   (ECF No. 77, at 19).   This argument – that, where there are two attachments and Bar Counsel does not reference both, it must be referencing a third – is nonsensical.   Defendants' counter-intuitive inference is insufficient to create a genuine dispute of fact, and Plaintiffs are entitled to summary judgment as to Defendants' disclosure claim.

Defendants also allege that Mr. Teras breached the Settlement by assisting Bar Counsel in its investigation of Ms. Wilde.   The parties agreed in the Settlement not to "affirmatively voluntarily encourage, cooperate with, or assist in any way in the prosecution of any case (civil or criminal) or proceeding against any other Party, including without limitation any pending Bar complaints."   (ECF No. 72-15, at 14).   The Settlement creates an exception to this rule for, *inter alia*, "responding to lawful requests from any government official including, without limitation, Bar counsel" or for "complying with the rules of professional conduct applicable to lawyers in any jurisdiction where such Party is licensed to practice." (*Id.*).   Defendants have produced numerous emails between Mr. Teras and Bar Counsel showing that he assisted in Bar Counsel's

investigation and prosecution of Ms. Wilde.  (ECF Nos. 73-13; 73-14; 73-15; 73-16; 73-17; 73-18; 73-19; 73-20).  At his deposition, Mr. Teras also admitted that he cooperated with Bar Counsel attorney Julia Porter and exchanged "several dozen" emails with her over the years.  (ECF No. 73-10, at 41, 45).[12]

Plaintiffs have not produced any evidence disputing the fact that Mr. Teras cooperated with Bar Counsel.  Rather, they contend that Mr. Teras's cooperation was required by the rules of professional conduct and that he was "responding to lawful requests from . . . Bar counsel or its agents." (ECF No. 74, at 25).  Plaintiffs cite to Rule 8.1, which prohibits a lawyer from "knowingly failing to respond reasonably to a lawful demand for information from a . . . disciplinary authority."  The emails between Mr. Teras and Ms. Porter, however, quite clearly do not constitute "demands" for the information he provided.  (ECF No. 77).

---

[12] Although Defendants argue that Mr. Teras assisted "both Maryland and D.C. Bar Counsel in their proceedings against Wilde" (ECF No. 73-1, at 46), all of the evidence they refer to in their motion papers relates to Mr. Teras's cooperation with D.C. Bar Counsel (*see* ECF Nos. 73-13; 73-14; 73-15; 73-16; 73-17; 73-18; 73-19; 73-20).  In the cited portions of his deposition, Mr. Teras states only that he received a subpoena to testify at Ms. Wilde's trial in front of the Maryland Attorney Grievance Commission and did so in March 2011.  (ECF No. 73-10 at 44).  Defendants therefore have not shown they are entitled to summary judgment as to liability for claims of assistance to Maryland Bar Counsel.

It is less clear that Mr. Teras was not "responding to lawful requests." Defendants maintain that responding to Bar Counsel subpoenas is the type of cooperation that the Settlement allows, (ECF No. 73-1, at 47), but, as Plaintiffs rightly point out, if response to a subpoena was the only thing covered by the "responding to lawful requests" provision, it would be duplicative of an earlier provision making an exception to the cooperation clause for "taking any actions required by law, such as responding to any court or administrative subpoenas or other process," (*see* ECF No. 72-15, at 14). Conversely, Defendants argue that if reviewing draft documents for typos and analyzing Ms. Wilde's legal arguments qualifies as responding to a lawful request, then it is difficult to imagine a scenario in which a party has cooperated or assisted with a Bar Counsel investigation without doing so in response to a lawful request. (ECF No. 77). Wherever the exact line between responding to lawful requests and voluntarily encouraging and assisting in a prosecution lies, Mr. Teras crossed it here. In his December 17, 2010 email, Mr. Teras tells Ms. Porter, "[I]f you want me to review [a draft of the charges] prior to filing for factual accuracy, I will be glad to do so." (ECF No. 73-20, at 1). On January 16, 2012, Mr. Teras provided considerable feedback on one of Ms. Wilde's briefs in the proceeding in response to an email from Ms. Porter where the only potential "lawful request"

was Ms. Porter stating, "Let me know if you have any questions or comments." (ECF No. 73-13, at 2). In July 2015, Mr. Teras provided edits to a draft from Ms. Porter in two separate emails, in response to her saying, "Let me know if you have any questions." (ECF No. 73-16, at 1-2). Plaintiffs point to nothing in the record that contradicts what appears on its face to be voluntary assistance. Given the evidence presented, there is no factual dispute that Mr. Teras voluntarily did more than what Ms. Porter requested in her emails. Defendants' motion will therefore be granted as to the Mr. Teras's liability for breaching these provisions.

Plaintiffs next argue that Defendants are entitled only to nominal damages for these breaches because the disciplinary proceedings with which Mr. Teras assisted were under way prior to the Settlement going into effect. (ECF No. 72-1, at 39). In her deposition, Ms. Wilde acknowledged that Bar Counsel generally could have obtained any substantive information Mr. Teras gave them through formal subpoenas. (ECF No. 73-4, at 24-25). Thus, Plaintiffs argue, Defendants have not provided any evidence showing that Mr. Teras's cooperation caused any harm to Ms. Wilde that would not have occurred on account of Bar Counsel's investigation absent his assistance. (ECF No. 72-1, at 40).

Defendants argue only that Mr. Teras's assistance "unnecessarily prolonged proceedings" against Ms. Wilde, but have not provided any evidence to support this. (ECF Nos. 73-1, at 47; 77, at 20).[13] The only specific allegation Defendants make is that Mr. Teras accompanied a witness to court in Korea, which led to additional material to which Ms. Wilde had to respond. (*Id.*). Defendants seem to insinuate that Bar Counsel might not have obtained that witness's testimony without Mr. Teras's assistance, but they fail to explain how merely "accompanying" a witness to court led to this purported difference. Because Defendants cannot show actual damages, Plaintiffs' motion will therefore be granted as to nominal damages on this counterclaim.

## IV. Conclusion

For the foregoing reasons, the motion for partial summary judgment filed by Plaintiffs will be granted in part and denied in part; the motion for partial summary judgment filed by Defendants will be granted in part and denied in part; and

---

[13] Although Plaintiffs noted in their response that Defendants had not cited any evidence that supports the contention that Mr. Teras's actions prolonged the proceedings (ECF No. 74, at 28), in Defendants' reply, they again failed to cite to the record, instead simply stating that "Wilde has provided evidence that Teras's effort prolonged proceedings" (ECF No. 77, at 20).

Plaintiffs' motion to strike exhibits will be denied. A separate order will follow.

                                                   /s/
                                        DEBORAH K. CHASANOW
                                        United States District Judge